Curtis MIZELL, Plaintiff,

v.

MIAMI–DADE COUNTY, FLORIDA, Defendant.

No. 03–21156–CIV.

United States District Court, S.D. Florida.

Oct. 22, 2004.

Leslie Holland, Esq., Leslie Holland, North Miami Beach, FL, for Plaintiff.

Eric Alberto Rodriguez, Esq., Dade County Attorney's, Miami, FL, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendant Miami–Dade County's Motion for Summary Judgment (DE # 33).

UPON CONSIDERATION of the motion and responses, and pertinent portions of the record, and being fully advised in the premises, this Court enters the following Order.

### BACKGROUND

Plaintiff Curtis Mizell, an African–America male, was an employee of Defendant Miami–Dade County from 1984 through July 26, 2002. Compl. ¶¶ 5, 7–8; Defendant's Statement of Undisputed Facts ("DSUF") ¶ 1. Plaintiff was employed as a police officer with the Miami–Dade Police Department ("MDPD"), a department of Defendant Miami–Dade County. Compl. ¶ 7; DSUF ¶ 1.

From approximately 1993 through 1997 Plaintiff was assigned to MDPD's Narcotics Bureau, and during that time Plaintiff came to know a confidential informant ("CI"). DSUF ¶¶ 4, 5; Mot. for Summ. J. at 3. At some point after the CI and Mizell were acquainted, the CI approached the MDPD, advising the Department that Mizell had discussed with her a scheme to rip-off drug dealers, where she would tip off Mizell about drug dealers coming into town with cash or other valuables, and then Mizell would steal the cash and give her a portion of the money. Mot. for Summ. J. at 3. MDPD's Professional Compliance Bureau (the "PCB") initiated an investigation based on these allegations of the CI. DSUF ¶¶ 9–10. Over a period of six months, the Internal Affairs ("IA") section of the MDPD tape recorded numerous conversations between Mizell and the CI.[1] Mot. for Summ. J. at 3; DSUF, Ex. A. During these taped conversations the CI advised Mizell of illegal drug activities of drug dealers coming into town with cash, and discussed with him scenarios for Mizell to conduct rip-offs of these drug dealers. Mot. for Summ. J. at 3.

On February 19, 2000, during one of their conversations, the CI asked Mizell to help her make money, to which he replied, "I got people watching me." DSUF, Ex. A. Later in the conversation, the CI identified an individual that would be involved in an illegal narcotics transaction, and would be carrying a large amount of money. *Id.* Mizell asked the CI the amount of money the individual would be carrying, the vehicle the individual would be driving, and the date the individual would be at the CI's residence. *Id.* The CI and Mizell further

---

1. The conversations between Mizell and the CI occurred on or about the following dates: January 19, 2000 to January 27, 2000, February 2, 2000, February 19, 2000 to February 24, 2000, May 8, 2000, and from June 19, 2000 to June 22, 2000. *See* DSUF, Ex. A.

discussed taking the individual's money, and Mizell asked for a picture of the individual. *Id.* In another conversation on February 23, 2000, Mizell asked the CI when the individual would be at her residence. *Id.* On February 24, 2000, Mizell again spoke with the CI, who told him that the individual with the money was in town, and in which direction the individual was traveling. *Id.* Later that day Mizell drove by the CI's house when the targeted individual was exiting her vehicle. *Id.* Although he drove by, Mizell did not stop at the house. In a taped conversation four days later, Mizell told the CI that he did not stop because there were too many police around, and he was fearful that it was a trap. *Id.*

In violation of the MDPD rules, Mizell did not tell anyone at MDPD about the ongoing criminal activity he had learned about during his conversations with the CI, nor did he tell anyone that he was having ongoing conversations with a confidential informant who was proposing further criminal activity. Mot. for Summ. J. at 4; DSUF, Ex. A. In a sworn statement given on June 25, 2001, Mizell admitted that he had had many conversations with the CI, and that she had provided information about drug dealers and illegal narcotics activity. He also admitted that he had not told anyone at MDPD about the conversations with the CI. DSUF ¶¶ 19–20. Further, in a sworn deposition, Mizell admitted that he violated MDPD policy, and that the MDPD was correct for disciplining him. Mizell Depo. at 52.

After the completion of the IA investigation, a Disposition Panel, composed of two MDPD majors and one MDPD chief, reviewed the evidence and determined that Mizell was engaged in planning a theft of money from drug dealers, that he failed to report his contact with the CI to MDPD,

and that he misrepresented his actions in his sworn statement. DSUF ¶¶ 29–32. Based on the IA investigation and the Disposition Panel's findings, a Disciplinary Action Report ("DAR") was prepared by the MDPD, and was presented to Mizell on June 26, 2002. *Id.* ¶ 33; *see* DSUF, Ex. A. The DAR stated that "[Mizell] failed to advise [his] supervisor that the CI involved in the case was propositioning [him] to become involved in the theft of money derived from illegal narcotics activity. [Mizell] failed to notify the proper investigative unit regarding the fact that a CI had provided [him] with information regarding a possible illegal narcotics transaction." DSUF, Ex. A. Further, Mizell performed an overt act when "[he] was later observed driving by the CI's residence as the targeted individual was exiting her vehicle." *Id.* The DAR concluded that "[t]he totality of evidence garnered from this investigation supports the finding that [Mizell] exhibited conduct unbecoming an officer, misrepresented and falsified statements to an IA Investigator, violated departmental standards regarding ethical conduct, and failed to obey pertinent departmental rules and procedures." *Id.*

Subsequently, Culter Ridge District Commander Major Leonard Burgess forwarded the DAR to Chief Robert Holden recommending that Mizell's employment be terminated. DSUF ¶ 35. Chief Holden, Assistant Director for Police Services Robert Parker, and MDPD Director Carlos Alvarez all concurred with the recommendation of termination.[2] *Id.* On July 26, 2002, Director Alvarez issued a letter to Mizell advising him of his termination from MDPD. *Id.*; DSUF, Ex. A.

Pursuant to Section 2–47 of the Miami-Dade County Code, Mizell appealed the

---

2. The Court notes that both District Commander Major Leonard Burgess and Assistant Director for Police Services Robert Parker are African–Americans. DSUF ¶ 35.

MDPD Director's decision to terminate him. The American Arbitration Association appointed Arthur J. Flamm as a neutral hearing examiner. DSUF ¶ 43. On September 20, 2002, Hearing Examiner Flamm conducted an evidentiary hearing on Mizell's appeal. *Id.* ¶ 44. On October 21, 2002, based on testimony, evidence and exhibits presented at the hearing, Flamm issued his Hearing Examiner's Report recommending that the termination be sustained. *Id.* ¶ 45. On November 7, 2002, County Manager Steve Shiver issued a decision on Mizell's appeal, sustaining the decision of the MDPD and confirming Mizell's dismissal. *Id.* ¶ 46.

Mizell did not appeal the County Manager's decision in the Florida state court system. *Id.* ¶ 47. According to the Complaint, on November 20, 2002, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and the Florida Commission of Human Relations. Compl. ¶ 3. The charge was amended on or about December 9, 2002. *Id.* Mizell was issued a Notice of Right to Sue on February 25, 2003. *Id.*

In the instant motion, Defendant Miami–Dade County moves for summary judgment, asserting that (1) Plaintiff cannot establish a prima facie case because he cannot show that any similarly situated employee was treated more favorably; (2) Plaintiff cannot establish a casual link between the allegedly unlawful animus of his Departmental supervisors and his ultimate termination; and (3) Plaintiff has not shown that the Defendant's decision to discharge him for misconduct was a mere pretext for discrimination. *See generally* Mot. for Summ. J.

## DISCUSSION

### I. Summary Judgment Standard

The applicable standard for reviewing a summary judgment motion is stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. *Twiss v. Kury,* 25 F.3d 1551, 1554 (11th Cir.1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

When considering a motion for summary judgment, "[t]he court may not weigh evidence to resolve a factual dispute; if a genuine issue of material fact is present, the court must deny summary judgment." *Holifield v. Reno,* 115 F.3d 1555, 1561 (11th Cir.1997) (citing *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir.1993)). Further, "if reasonable minds could differ on the inferences arising from the undisputed facts, then the court should deny summary judgment." *Id.* (citing *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir.1992)).

On a summary judgment motion, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). However, the non-moving party:

> may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In determining whether this evidentiary threshold has been met, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505. Summary judgment may be granted if the non-movant fails to adduce evidence which, when viewed in a light most favorable to the non-movant, would support a jury finding for the non-movant. *Id.* at 254–55, 106 S.Ct. 2505.

Additionally, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *Id.*

## II. Discrimination under Title VII

■ Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1)(2004). A plaintiff may establish a prima facie case of discrimination by circumstantial evidence of discriminatory intent. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Holifield*, 115 F.3d at 1561.

■ Under the three-step burden shifting framework established in *McDonnell Douglas*, a Title VII complainant carries the initial "burden of establishing a prima facie case of racial discrimination." 411 U.S. at 802, 93 S.Ct. 1817. A plaintiff must show: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his protected classification more favorably; and (4) he was qualified to do the job. *Id.; see also Holifield*, 115 F.3d at 1562. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield*, 115 F.3d at 1562 (citations omitted).

■ Once the plaintiff has established a prima facie case, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. "This may be done by the employer articulating a legitimate, non-discriminatory reason for the employment decision, which is clear, reasonably specific, and worthy of credence. The employer has a burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced." *Hall v. Ala. Ass'n of Sch. Bds.*, 326 F.3d 1157, 1166 (11th Cir.2003) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–55, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

If the defendant meets his burden, "then the plaintiff may attempt to show that the proffered reason was merely a pretext for the defendant's acts." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1310 (11th Cir.1998) (citing *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). "The employee may satisfy this burden either directly, by persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly, by persuading the court that the proffered reason for the employment decision is not worthy of belief. By so persuading the court, the employee satisfies his ultimate burden of demonstrating by a preponderance of the evidence that he has been the victim of unlawful discrimination." *Hall*, 326 F.3d at 1166 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). Despite this burden shifting test, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Jones*, 137 F.3d at 1310 (citing *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089).

### A. Prima Facie Case of Race Discrimination

In its Motion for Summary Judgment, Defendant argues that Plaintiff Mizell has failed to establish a prima facie case that he was dismissed because of his race. There is no dispute that Plaintiff Mizell belongs to a racial minority, or that he was subjected to adverse job action. However, Defendant contends that Mizell's case must fail because he cannot identify similarly situated, non-minority employees who were treated more favorably. Mot. for Summ. J. at 5–6. In order to establish a prima facie case, "the plaintiff must show that his employer treated similarly situated employees outside his classification more favorably than [himself]." *Holifield*, 115 F.3d at 1562 (citations omitted). Further, "[t]o make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in *all relevant respects*." *Id.* (citations omitted) (emphasis added). Therefore, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* (citations omitted). When a plaintiff has failed "to show the existence of a similarly situated employee, summary judgment is appropriate when no other evidence of discrimination is present." *Id.*

In *Jones*, the Eleventh Circuit explained that "[t]he most important factors 'in the disciplinary context ... are the nature of the offenses committed and the nature of the punishments imposed.'" 137 F.3d 1306, 1311 (11th Cir.1998) (citing *Jones v. Gerwens*, 874 F.2d 1534, 1539–40 (11th Cir. 1989)). Further, the Eleventh Circuit "require[s] that the quantity and quality of the comparator's misconduct be nearly identical to prevent court's from second-guessing employers' reasonable decisions and confusing apples and oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999). "If Plaintiff fails to identify similarly situated, nonminority employees who were treated more favorably, her case must fail because the burden is on her to establish her prima facie case." *Jones*, 137 F.3d at 1311. Here, Plaintiff has failed to satisfy that burden.[3]

Plaintiff points to five officers, Raymond Beahn, Carolyn Evelyn, Glenn Crosby, Kent Jurney, and Dominick Columbro whom he believed engaged in misconduct similar to his, but received less

---

3. Because Mizell has not shown that Defendant treated similarly situated employees outside his protected classification more favorably than him, there is no need for this Court to address whether Mizell was qualified to do his job.

severe punishments. Resp. to Mot. for Summ. J. ("Resp.") at 3–5. Additionally, Plaintiff claims the actions of officers Dak Simonton and Melissa Peacock, and that of Lieutenant Frederick Hafner, were more egregious than his actions, yet they were treated more favorably by the Defendant. Resp. at 5–7. Importantly, although Plaintiff claims that the actions of Officer Simonton and Peacock, and that of Lieutenant Hafner, were more egregious than his own and that they received more favorable treatment from the Defendant Miami–Dade County, he does not argue that they are similarly-situated.[4]

▮▮▮ Relevant to this Court's analysis is the premise that "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Maniccia*, 171 F.3d at 1369 (citing *Jones*, 137 F.3d at 1311). In this case, even viewing the evidence in the light most favorable to the plaintiff, the Court concludes that the misconduct engaged in by Officers Beahn, Evelyn, Crosby, Jurney, Columbro, Simonton, and Peacock, and by Lieutenant Hafner, is easily distinguished from the misconduct engaged in by Mizell, on the basis of both the quantity and quality of the misconduct. Whereas Mizell planned with the CI, over a span a six months, to steal money from drug dealers, each of the officers Mizell claims to be similarly situated was involved in a single incident of misconduct or alleged misconduct. Moreover, the punishments received by Officers Evelyn, Crosby, Jurney and Peacock were a result of a Memorandum of Understanding between the respective officer and the MDPD, therefore the pun-

ishments they received were understandably less severe because their cooperation saved the MDPD the expenditure of funds and resources. For the reasons explained below, the Court concludes that the conduct of the officers and lieutenant whom Mizell claims to be similarly situated to himself, are distinguishable from Mizell's conduct.

### 1. Officer Raymond Beahn

Officer Raymond Beahn is a white police officer for the MDPD. Resp. at 3. Officer Beahn was charged with involving himself in a narcotics investigation while off-duty. Valdez Depo., Ex. 1. The details of Officer Beahn's offense are as follows: Officer Beahn was at his ex-girlfriend's house, and lent her $20. *Id.* Because he believed the $20 would be used to purchase drugs, he marked the back of the bill with his badge number before giving it to her. *Id.* After leaving her apartment, Officer Beahn conducted surveillance on the apartment and surrounding area, and observed a man meeting with his ex-girlfriend. *Id.* When the man attempted to leave the area, Office Beahn stopped him using a portable blue light. *Id.* Officer Beahn confiscated the $20 from the man, and then allowed the man to leave. *Id.*

In a sworn statement given to the PCB regarding the incident, Officer Beahn contradicted himself, stating that he had not seen his ex-girlfriend for two months prior, and then directly afterwards stating that he had lent her $300 the day before the incident. *Id.* Officer Beahn also contradicted himself regarding his knowledge of his ex-girlfriend's drug problem. Additionally, Officer Beahn used a County

---

4. Plaintiff discusses Officers Beahn, Evelyn, Crosby, Jurney and Columbro under the heading: "Defendant's Treatment of Similarly Situated White or Hispanic Officers." Officers Simonton and Peacock, and Lieutenant Hafner are discussed under the heading:

"Defendant's Treatment of White or Hispanic Officers Who Engaged in More Egregious Conduct." Therefore, it appears that Plaintiff is not arguing that Officer Simonton and Peacock, or Lieutenant Hafner are similarly situated.

phone to make personal beeps or calls to his ex-girlfriend. *Id.* In a DAR dated November 30, 2000, Officer Beahn received a five-day suspension for police action while off duty, misrepresentation or falsification, and using a departmentally issued mobile phone or portable phone for personal beeps or calls.

In a second DAR issued on August 25, 2003, Officer Beahn was found to have violated departmental rules by failing to transport an intoxicated person back to where he was originally detained, failing to notify a supervisor about the situation, and failing to document the situation in an Offense–Incident Report. *Id.* Ex. 2. Officer Beahn received a written reprimand for these violations.

Even viewing the evidence in the light most favorable to the plaintiff, this Court concludes that Officer Beahn is not similarly situated in all relevant respects to Mizell. Whereas Mizell's misdeeds took place over a span of at least six months, Officer Beahn's off-duty investigation was an isolated incident, apparently motivated by a personal relationship. Unlike Mizell, Officer Beahn was not plotting to break the law and steal money from drug dealers. Further, Officer Beahn was not using his position as a police officer, or his badge, to enrich himself. The second incident for which Officer Beahn received a punishment is not even close to similar to the misconduct of Mizell, therefore the Court need not address it further. The quantity and quality of Officer Beahn's and Mizell's misconduct are not similar. Because Mizell and Officer Beahn were not involved in or accused of the same or even similar conduct, the Court concludes they are not similarly situated.

2. Officer Carolyn Evelyn

Officer Carolyn Evelyn is a white police officer for the MDPD. Resp. at 4. On January 5, 1999, Officer Evelyn became involved in a non-contact shooting incident while off-duty. Valdez Depo., Ex. 10. The following afternoon, Officer Evelyn requested a meeting with her immediate supervisor, where she admitted that she had discharged a personally owned handgun while off-duty. *Id.* She explained that while she was asleep in her daughter's room, she heard male voices outside the residence, and that the men were discussing breaking into the residence. *Id.* She searched the property and spotted the men, one of whom kneeled and pointed a gun at her. Officer Evelyn told the suspect to drop the weapon, and then fired a shot when he refused. *Id.* When police officers responded to the area, they asked Officer Evelyn if she heard shots fired. She told them she did not, and that she had been outside walking her dog. *Id.* An August 3, 1999 DAR concluded that Officer Evelyn did not immediately report the incident, and made misrepresentations or falsifications regarding the incident to the responding officers. *Id.* She received a twenty day suspension per a Memorandum of Understanding between her and the MDPD.

The nature of the offense committed by Officer Evelyn is not the same or even similar to Mizell's actions. Again, as with Officer Beahn, Officer Evelyn's conduct was an isolated incident. Officer Evelyn was not conversing with a CI to break the law, but was apparently defending herself and her residence from would-be robbers. Further, Officer Evelyn's misrepresentations were not made during sworn testimony, but rather, were made to a officer responding to the scene, when she was "upset" and "not thinking clearly." Valdez Depo., Ex. 10. Moreover, Officer Evelyn met with her supervisor the next afternoon to give a true account of her actions. Mizell, on the other hand, made misrepresentations and/or falsifications under oath to the IA investigators. The quality and

quantity of Officer Evelyn's misconduct and Mizell's misconduct are not the same or even similar.[5]

### 3. Officer Glenn Crosby

Officer Glenn Crosby is a white police officer with the MDPD. Resp. at 4. A January 10, 2000 DAR states that Officer Crosby verbally misrepresented or falsified his normal work schedule, resulting in a pre-trial conference being scheduled during his off duty hours. *See* Plaintiff's Not. of Filing DAR on Glenn Crosby in Support of His Resp. (DE # 51). Officer Crosby's misrepresentations resulted is an unnecessary expenditure of overtime monies. *Id.* Officer Crosby was given a three-day suspension pursuant to a Memorandum of Understanding between him and the MDPD. *Id.*

First, it is unbelievable to the Court that Plaintiff would even suggest that misrepresenting normal work hours is somehow comparable to planning, over a period of six months, to steal money from drug dealers. These offenses are not even remotely

similar. Further, as with Officer Evelyn, Officer Crosby entered into a Memorandum of Understanding with the MDPD. Based on these two factors, Mizell cannot reasonably argue that Officer Crosby was similarly-situated.[6]

### 4. Officer Kent Jurney

Officer Kent Jurney is a white police officer with the MDPD. Resp. at 5. A DAR dated April 19, 1999, explains that Officer Jurney witnessed another officer kicking and striking a suspect who had escaped from their custody. Valdez Depo., Ex. 15. During the IA investigation, Officer Jurney supported the suspect's account of the incident. *Id.* However, when Officer Jurney was called as a witness during a formal appeal hearing, he gave contradictory testimony. *Id.* When he was later questioned by an IA Sergeant regarding the matter, he again confirmed the suspect's allegation. *Id.* The DAR alleges misrepresentation or falsification, lack of loyalty, and conduct unbecoming an officer. *Id.* Pursuant to a Memorandum of Under-

---

**5.** Even if Officer Evelyn is similarly situated to Mizell (which she is not), the Court cannot conclude that she was treated more favorably than Mizell. Granted, Mizell and Officer Evelyn's punishments were different. However, this difference in outcome is attributable at least, in part, to a different process utilized in determining the appropriate punishment. Officer Evelyn's punishment was eventually resolved by way of a Memorandum of Understanding or agreement with the MDPD. Not surprisingly, this agreed upon punishment was likely to result in a lesser punishment than what would have otherwise been imposed, even assuming similar conduct, precisely because it had been agreed to as opposed to being contested, as was the case with Mizell. Mizell makes no claim, nor does he present any evidence, that he was denied the opportunity to enter into a similar mutually agreed upon punishment. In addition, he makes no claim that any such denial resulted in his alleged less favorable treatment. Moreover, given the obvious difference in conduct,

the MDPD could well conclude that any punishment short of termination would not have been subject to agreement. In any case, because a different process was employed to determine the appropriate punishments for Officer Evelyn and Mizell, Mizell has not shown that Officer Evelyn was more favorably treated.

**6.** A MDPD PCB Employee Profile for Officer Glenn Crosby indicates that in 1992 he received a five-day suspension for his actions during an investigation of a robbery scene, which diminished his credibility during that investigation, and in 1999, Officer Crosby received a written reprimand after he was involved in a preventable County vehicle accident. Valdez Depo., Ex. 12. Because there is no further information regarding these two disciplinary actions on the record, and only one sentence of Plaintiff's Response refers to these offenses, the Court cannot conclude that these offenses are of the same nature as those committed by Mizell.

standing between Officer Jurney and the MDPD, he was given a twenty day suspension. *Id.*

Officer Jurney is not similarly situated to Mizell. As with all of the other officers discussed *supra,* Officer Jurney's conduct is not of the same nature as Mizell's conduct. Although Officer Jurney gave contradictory testimony in a formal appeal hearing, he did not plan to steal money from drug dealers over an extended six month period. Therefore, the Court finds that the quality and quantity of the misconduct is not similar to Mizell's misdeeds. Further, as with Officers Evelyn and Crosby, Officer Jurney's punishment was agreed upon in the Memorandum of Understanding between him and the MDPD.[7]

### 5. Officer Dominick Columbro

Dominick Columbro is a Hispanic officer with the MDPD. Resp. at 5. Officer Columbro received a written reprimand for discussing an IA investigation of a fellow officer with a witness. *See* Plaintiff's Notice of Filing DAR on Dominick Columbro in Support of His Resp. (DE # 52). A June 24, 2002 DAR explains that Officer Columbro was contacted by a witness in an IA investigation, and arranged to meet her at her residence. *Id.* When meeting with the witness, Officer Columbro informed her of his fellow officer's duty status. *Id.* The Disposition Panel opined that Officer Columbro should not have discussed an IA investigation with a witness, should have referred the witness to the PCB, should have apprised his supervisors in his chain of command and the PCB that the witness

had contacted him, and should not have responded to her residence to discuss the matter. *Id.*

Unlike Officer Mizell, Officer Columbro did not make misrepresentations or give false testimony under oath. Officer Columbro was attempting to exonerate a fellow officer. He did not plan to steal money from drug dealers. His actions were an isolated incident, and did not occur over an extended period of time. Officer Columbro's actions were clearly not of the same nature, or the same quantity as Mizell's. Therefore, Officer Columbro is not similarly situated.

### 6. Officer Dak Simonton

Officer Dak Simonton is a white police officer with the MDPD. Resp. at 5. Although Plaintiff's Response refers to a DAR for Officer Simonton, it does not appear to be part of the record.[8] However, based on the deposition of then-MDPD Director Alvarez, the allegation against Officer Simonton was that he held the hand of an 11-year-old girl, inappropriately touched her between the knee and upper thigh, and tried to kiss her. Alvarez Depo. at 33. According to Alvarez's deposition, the DAR concluded that Officer Simonton's behavior was inappropriate, conduct unbecoming an officer, and an unethical violation. *Id.* at 34. Officer Simonton was recommended for termination, but he received no discipline. *Id.* at 42. Alvarez explained that the mother of the alleged victim was willing to give a formal affidavit that the incident was a misunderstanding.

---

**7.** The record also indicates that Officer Jurney received a written reprimand in 2000 for failing to follow departmental firearm safety procedures, resulting in the firearm being discharged accidentally in public. Valdez Depo., Ex. 16. As there is no further information in the record regarding this incident, and Plaintiff has failed to mention it in his Response, the Court cannot determine whether this offense is of the same nature as those committed by Mizell.

**8.** Officer Simonton's DAR appears to be Exhibit 1 of the Alvarez Deposition. However, Exhibit 1 was not included in the Plaintiff's filing of the Alvarez deposition, therefore it is not part of the record.

*Id.* at 42–43. Based on advice Alvarez received from the MDPD Legal Bureau, he decided not to terminate Officer Simonton. Alvarez believed if the decision to terminate was appealed by Officer Simonton, MDPD could not win because there was insufficient evidence to sustain the disciplinary action. *Id.* at 43–50.

It does not appear from the Response that Mizell is claiming that Officer Simonton is similarly situated to himself. Although the arguments in the Response are unclear on this point, it seems that Plaintiff is arguing that Officer Simonton's actions are more egregious than his own, yet he was treated more favorably by Defendant. Although Director Alvarez did not follow the recommendation to terminate Officer Simonton, Alvarez was advised by the MDPD Legal Bureau that the allegations against Officer Simonton would likely not be sustained if the termination was appealed. Additionally, Alvarez had spoken with the victim's mother, who was willing to sign an affidavit that the entire incident was a misunderstanding. Title VII does not take away the MDPD's right to make determinations as it sees fit under its rules. In Mizell's case, there was no indication that the allegations against Mizell would not be sustained if appealed, and in fact, the allegations were sustained, and the termination was upheld. Moreover, while the allegations against Officer Simonton are extremely serious, they are not of the same nature as the misconduct committed by Mizell. Officer Simonton did not use his position as a police officer or his badge to enrich himself. Officer Simonton is not similar-situated.

### 7. Officer Melissa Peacock

Officer Melissa Peacock is a white MDPD police officer. Resp. at 7. A DAR dated November 15, 2000, explains that Officer Peacock was directed to return a departmental red and blue strobe light. Valdez Depo., Ex. 23. Officer Peacock initially disobeyed the direct order to return the strobe light, and when she finally did comply, she threw the light and her badge at the sergeant, and shouted obscenities at him. *Id.* The DAR charged Officer Peacock with violating departmental rules regarding obedience to orders, rules governing conduct, obedience to laws and rules, duty responsibilities, conduct unbecoming an officer, conduct toward superiors, subordinates, and associates, integrity and respect. *Id.* Per a Memorandum of Understanding between Officer Peacock and the MDPD, she received a ten day suspension. *Id.*

First, Officer Peacock's offense is clearly not of the same nature as the offense committed by Mizell. Officer Peacock's actions involve disobedience and disrespect to superiors, whereas Mizell was planning to steal from drug dealers, and was planning to use his position to enrich himself. Second, as with Officers Evelyn, Crosby and Jurney, Officer Peacock's punishment was agreed upon in a Memorandum of Understanding. As explained *infra*, for purposes of establishing a prima facie case, even if Officer Peacock was similarly situated (which she is not), the Court cannot conclude that she was treated more favorably simply because her punishment was less severe than Mizell's, as it was reached by agreement. Further, as with all the other officers discussed, Officer Peacock's misconduct was not of the same quantity or quality as Mizell's, therefore she is not similarly situated.

### 8. Lieutenant Frederick Hafner

Lieutenant Frederick Hafner is a white police lieutenant with the MDPD. Resp. at 7. Lieutenant Hafner received a ten day suspension for conduct unbecoming an officer, overreacting, and for violating MDPD's rules on courtesy. Valdez Depo., Ex. 14. Specifically, while working an off-

regular duty job guarding the transfer of a high value cargo shipment, Lieutenant Hafner confronted a Brinks Global Service security guard whose armored truck was blocking the path Lieutenant Hafner needed to follow the tug carrying the cargo. *Id.* The security guard said he would move the truck when the cargo was loaded in. Lieutenant Hafner approached the guard, grabbed his neck and pulled his arm behind him. *Id.* In a statement to the PCB, Lieutenant Hafner attempted to justify his actions by stating that he pushed the security guard in order to do a pat down search, and that he confronted the security guard a second time because of the condescending smirk on the guard's face. *Id.* The DAR concluded that Lieutenant Hafner's behavior during the incident was totally improper, unprofessional, and contrary to the MDPD's core values of service, integrity, respect and fairness. *Id.*

As an obvious preliminary point, Lieutenant Hafner cannot be similarly situated to Mizell because their ranks are not equal. Moreover, the nature of their offenses are not similar. Lieutenant Hafner was accused of using excessive force. Again, as with many of the other officers Mizell argues are similarly situated, Lieutenant Hafner's actions were an isolated incident, and did not involved prolonged planning of a criminal act.

### B. Prima Facie Case of National Origin Discrimination

Plaintiff's Complaint alleges that his termination was based upon his national origin. He classifies his national origin as "non-Hispanic." Plaintiff is confusing his race with his national origin, which is American. Though Plaintiff's Response notes the race of the officers he claims to be similarly situated, he does not even allege that these individuals are of a different national origin. Moreover, Mizell claims his national origin is "non-Hispanic." The only "Hispanic" officer Mizell argues to be similarly situated is Officer Columbro. For the reasons stated *supra,* Officer Columbro is not similarly situated. Therefore, this Court concludes that Mizell has failed to establish a prima facie case of national origin discrimination.

### C. Legitimate Non–Discriminatory Reason for Termination

 Plaintiff has not established a prima facie case of racial or national origin discrimination. Moreover, Defendant has clearly articulated several legitimate, non-discriminatory reasons for Mizell's termination. The Court need not belabor the point, as Mizell himself concedes in his deposition that he violated MDPD policy, and that the MDPD was correct for disciplining him. Mizell Depo. at 52. The Disposition Panel reviewing Mizell's case found that "the totality of the evidence gleaned from the Internal Affairs investigation supports the findings that Officer Mizell planned to commit grand theft and; in doing so; exhibited conduct unbecoming an officer; misrepresented and falsified statements to the Internal Affairs investigator, violated departmental standards regarding ethical conduct, and failed to obey pertinent departmental rules and procedures." DSUF, Ex. B. Defendant's proffered reason for Mizell's termination is clear, reasonably specific, and worthy of credence. Therefore, Defendant has fully met its burden to show a legitimate non-discriminatory reason for Mizell's termination.[9]

---

9. In addition to meeting its burden of showing a legitimate non-discriminatory reason for Mizell's termination, Defendant has provided compelling evidence of Hispanic and White officers who were terminated for misconduct arguably less severe than Mizell's conduct. Reply at 16–17, Ex. 1–7.

### D. Proffered Reason Merely Pretext for Defendant's Acts

Even assuming that Plaintiff had established a prima facie case of discrimination, Plaintiff has not even presented an argument to show that Defendant's proffered reason for terminating him was merely a pretext. Plaintiff has in no way persuaded the Court that a discriminatory reason more than likely motivated Defendant. Plaintiff has not even indirectly persuaded the Court that the proffered reason for Mizell's termination is not worthy of belief.

Plaintiff contends that "[he] has established that defendant's reliance on his conduct as grounds for terminating him is merely a pretext for discrimination." Resp. at 10. To the contrary, this statement is the only reference Plaintiff's Response makes to Plaintiff's burden of showing that Defendant's proffered reason for terminating him was merely a pretext for Defendant's acts. Plaintiff makes no additional argument to support this conclusory statement.

Relevant to a showing that Defendant's reason for terminating Mizell would be evidence that white or Hispanic employees involved in acts against Defendant of comparable seriousness were nevertheless retained. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817. As discussed *supra*, Mizell's misconduct was more serious, and not of the same quality and quantity as the offenses committed by the officers Mizell claims to be similar situated. Additionally, "[o]ther evidence that may be relevant to any showing of pretext includes facts as to the [Defendant's] treatment of [Plaintiff] during his prior term of employment; ... and [Defendant's] general policy and practice with respect to minority employment." *Id.* Also, "statistics as to [Defendant's] employment policy and practice may be helpful to a determination of whether [Defendant's termination of Plaintiff] in this case

conformed to a general pattern of discrimination against blacks." *Id.* Plaintiff has made no such arguments, not presented any evidence to this effect.

Therefore, not only has Plaintiff failed to establish a prima facie case of race or national origin discrimination, Plaintiff also has failed to show that Defendant's proffered reason for his termination is merely a pretext, or that a discriminatory reason more than likely motivated the employer, or that Defendant's proffered reason is not worthy of belief.

### CONCLUSION

Based on the foregoing, it is

ORDERED AND ADJUDGED that Defendant Miami–Dade County's Motion for Summary Judgment (DE # 33) is GRANTED. All pending motions are DENIED AS MOOT. This case is CLOSED.